**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**NORTHERN DIVISION**

| | | |
|---|---|---|
| WILLIAM H. HENSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No.: 2:17CV58 HEA |
| | ) | |
| BONNIE BRENNAN, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## OPINION, MEMORANDUM AND ORDER

This matter is before the Court on Defendants' Motion for Summary
Judgment, [Doc. No. 105] and Plaintiff's Motion for order to obtain medical
treatment [Doc. No. 124]. For the reasons set forth below, Defendants' Motion is
granted, and Plaintiff's Motion is denied.

### Facts and Background

Plaintiff alleges that Defendants violated his Eighth Amendment rights
through deliberate indifference to his serious medical needs while he was an
inmate at the Northeast Correctional Center ("NECC").

Defendants have, in accordance with the Court's Local Rules, submitted a
Statement of Uncontroverted Material Facts. Plaintiff failed to respond to

Defendants' facts.[1]  Pursuant to Rule 56 of the Federal Rules of Civil Procedure and Rule 7-401(E) of this Court's Local Rules, Defendants' facts are deemed admitted. Local Rule 7-401(E) provides:

> Rule 7 - 4.01 Motions and Memoranda.
>
> (E) A memorandum in support of a motion for summary judgment shall have attached a statement of uncontroverted material facts, set forth in a separately numbered paragraph for each fact, indicating whether each fact is established by the record, and, if so, the appropriate citations. Every memorandum in opposition shall include a statement of material facts as to which the party contends a genuine issue exists. Those matters in dispute shall be set forth with specific references to portions of the record, where available, upon which the opposing party relies. The opposing party also shall note for all disputed facts the paragraph number from movant's listing of facts. All matters set forth in the statement of the movant shall be deemed admitted for purposes of summary judgment unless specifically controverted by the opposing party.

The undisputed facts are as follows:

At all times relevant to his Complaint, Plaintiff William Henson was an inmate at NECC in Bowling Green, Missouri.

---

[1] In his response to Defendants' Motion for Summary Judgement, Plaintiff references the November 17, 2016 Department Accident/Incident Cause Evaluation signed by Corrections Officer Daniels that was submitted by Defendants in response to a subpoena for documentary evidence.  Plaintiff asserts that this evidence is incomplete, i.e. that Defendants are "burying" photographs and additional documents related to his injury.  Plaintiff avers that he witnessed Corrections Officer Collins photographing the incident scene and that CO Collins told Plaintiff that he submitted photographs and a written report.

In a previous filing [Doc. No. 111], Plaintiff stated that "these documents are required to respond to Defendants' Motion for Summary Judgement as Defendants' Counsel is challenging that an injury occurred on November 17, 2016."  However, Defendants do not dispute that Plaintiff fell and injured his head on November 17, 2016.  The Court need not reach Plaintiff's bold assertion that Defendants are withholding documents and photographs because, even if they exist, those exhibits would be immaterial to the issue presented, which is whether Defendants were deliberately indifferent to Plaintiff's medical condition in violation of the Eighth Amendment.

At all times relevant to Plaintiff's Complaint, the State of Missouri contracted with Corizon to provide medical care and treatment to offenders incarcerated within the Missouri Department of Corrections ("MDOC").

Defendant Bonnie Brennan was employed by Corizon as a nurse practitioner at NECC. While assigned to NECC, Brennan's duties consisted of providing medical care and treatment to the inmates at the institution, which included identifying patients' health problems on a case-by-case basis and prescribing and implementing treatment plans approved by a Corizon physician.

Defendant Tamara Anderson was employed by Corizon as a Health Services Administrator (HSA) at NECC. While assigned to NECC, Anderson's duties consisted of managing health systems and staff functions. Anderson was not responsible for developing treatment plans for patients. Rather, it was the responsibility of Corizon physicians to create treatment plans and order medications for patients on a case-by-case basis.

One of Defendant Anderson's job functions as HSA was to review inmate grievances related to medical care, review the relevant medical records, and issue written responses and/or meet with inmates to resolve their complaints. The MDOC has an administrative policy in place for the resolution of inmate grievances. The MDOC grievance policy has three major phases: The Informal Resolution Request, Offender Grievance Process, and Appeal Process. The

MDOC grievance policy directs that staff should respond to Informal Resolution Requests (IRRs) within 40 days. Expiration of this time limit will allow an inmate to proceed to the next stage of the grievance process. In resolving inmate grievances related to medical care, the HSA reviewed the relevant medical records to ensure that requests for medical care were addressed and that treatment plans ordered by physicians were implemented. Defendant Anderson had no authority to compel a Corizon physician to order a different plan of treatment as part of the grievance resolution process.

On July 26, 2016, Plaintiff transferred to NECC from another prison camp.

At approximately 1:30 a.m. on July 28, 2016, Plaintiff self-declared a medical emergency for back pain. Corizon Nurse Hunter responded to the call and noted that Plaintiff complained of pain from a spinal cord injury sustained in 2003 that was surgically repaired in 2005. Nurse Hunter recorded that Plaintiff complained of increased pain at the incision area from the 2005 surgery, as well as numbness and pain in his right leg and foot. Nurse Hunter observed no physical injuries, so she educated Plaintiff about the processes for Health Services Requests (HSR), sick call, and medication times.

On July 29, 2016, Plaintiff submitted an HSR for complaints of "worsening symptoms and meds." It was received by the medical department on July 31, and an appointment was scheduled for August 24.

On August 24, 2016, Dr. Paniagua, a Corizon physician, saw Plaintiff in Corizon's "chronic care clinic" for chronic pain to address complaints of lower back pain. Dr. Paniagua assessed Plaintiff as having low back pain at his L1 spinal segment, but a normal gait and normal range of motion in his extremities. Dr. Paniagua ordered Tramadol to treat Plaintiff's pain and discontinued his pre-existing order for Gabapentin. On August 31, Dr. Paniagua requested outside medical records from Forrest Park Hospital to review Plaintiff's medical history of a spinal cord injury. The records arrived at NECC on September 19.

On September 7, 2016, Plaintiff filed IRR NECC 16-1159 in which he complained that he was given an incorrect medication in place of Tramadol on August 29. Defendant Anderson met with Plaintiff to discuss his IRR on September 13. She told Plaintiff that there was no evidence that he had been given the wrong medication in place of Tramadol. She nonetheless informed Plaintiff that she would meet with nursing staff to remind them of the importance of correct medication administration and professionalism. Anderson considered Plaintiff's IRR to be resolved through discussion. Plaintiff requested that his old medical records and Electromyography (EMG) studies be reviewed to validate that he had nerve damage as a result of complications from back surgery. Anderson agreed to review the records.

On October 13, 2016, Plaintiff filed IRR NECC 16-1357, in which he complained of receiving incorrect and inadequate medications to treat his chronic pain and numbness in his legs. He wrote in his IRR that his Gabapentin (Neurontin) was discontinued and that as a result, he lost feeling in his left leg and fell twice on unspecified dates. His IRR also stated that he had not been seen by medical personnel for his chronic pain issues. Nurse Niemeyer met with Plaintiff on October 13 to address Plaintiff's complaints of numbness and nerve pain. Plaintiff explained that his pain arose from a prior motor vehicle accident resulting in spinal cord damage. Plaintiff further explained to Nurse Niemeyer that his order for Gabapentin was discontinued and that he currently took Tramadol and Cymbalta (a nerve pain medication) for pain. He stated that he needed both Tramadol and Gabapentin to effectively treat his pain. Nurse Niemeyer referred him to the chronic care physician for further evaluation and follow-up.

On October 28, Defendant Anderson met with Plaintiff to follow-up on Plaintiff's request that his old medical records be reviewed to confirm nerve damage. During this encounter, Anderson reviewed prior medical records and Electromyography (EMG) studies with Plaintiff. Anderson told Plaintiff that, according to her review of the medical records, EMG studies did not confirm positive results for nerve damage. She noted that records from Cameron Regional Medical Center stated that Plaintiff was being weaned off Gabapentin and

Tramadol.  Plaintiff told Anderson at their meeting that he was going to fall due to numbness and pain in his leg.  Anderson encouraged him to submit a medical services request if he felt that he needed to be seen by a physician to determine if diagnostic testing was indicated.  Plaintiff ended the conversation by stating that he intended to file more IRRs for his pending lawsuit.

On November 1, 2016, Plaintiff submitted an HSR for complaints of chronic back pain and requested to be seen by a physician.  That same day, a Corizon nurse responded to the HSR and Plaintiff told the nurse that he needed to be seen by a physician about his chronic leg pain.  The nurse referred Plaintiff for an appointment with a physician.  Plaintiff had an appointment with Dr. Paniagua on November 9, 2016 that was rescheduled because Plaintiff was unable to attend.

MDOC policy directs that inmates have access to 24-hour emergency medical care as needed.  The MDOC defines Emergency Care as: "Care for an acute illness or an unexpected health need that cannot be deferred until the next scheduled sick call or clinic."  MDOC policy directs that custody staff will transport an inmate to the Medical Unit in the event of a medical emergency and contact medical staff for any questions.  True medical emergencies are reserved for conditions that require immediate attention in order to preserve life or bodily function.  Numbness in the legs is not usually a condition that threatens life or bodily function, so it does not constitute a medical emergency.  MDOC custody

officers will notify medical staff of a "CODE 16" if they observe a perceived emergency condition that requires an immediate response.

On November 17, 2016, Plaintiff self-declared a medical emergency. MDOC officers did not notify medical of a CODE 16 related to Plaintiff on November 17, 2016. Though the MDOC did not issue a CODE 16 for Plaintiff's complaints, Corizon Nurse Roed responded to Plaintiff's self-declared emergency at approximately 5:45 p.m. on November 17, 2016, and Plaintiff stated that his leg gave out and he hit his head on the sink in his housing unit. Nurse Roed observed that Plaintiff's range of motion in his legs was within normal limits, and saw no signs of pain with movement. She observed a small open area and redness above Plaintiff's left eyebrow. She further determined that Plaintiff had an elevated pulse and blood pressure.

Nurse Roed contacted Defendant Brennan about Plaintiff's self-declared emergency due to his abnormal vital signs and because he appeared to have a potential head injury. Brennan ordered that Plaintiff be placed in the infirmary for observation. Plaintiff was monitored in the infirmary for approximately four hours and then discharged after nursing staff observed stable vital signs and Plaintiff voiced no additional complaints. Nursing staff noted that Plaintiff was already scheduled for a follow-up appointment with a medical practitioner.

Defendant Anderson never directed any corrections officer to falsify information about Plaintiff or about the events surrounding November 17, 2016.

On November 18, 2016, Plaintiff filed IRR NECC 16-1615 in which he complained that he began experiencing pain and loss of feeling in his left leg on November 17, 2016.  He stated in his IRR that he attempted to self-declare a medical emergency three times between 4:00 p.m. and 6:00 p.m. on November 17.  He wrote that on or about 6:35 p.m., he fell and struck his left upper forehead on the sink in housing unit 2-C as a result of a loss of feeling in his left leg.  Plaintiff added in his IRR that other inmates complained about a "staff physician by the name of Brennon [sic]" who refused to treat them because they were smokers.

Plaintiff filed an HSR on November 18, 2016, complaining that his left leg went numb and caused him to fall and hit his head on November 17.  He wrote in his HSR that ever since the fall, the vision in his left eye was blurry.

Dr. Paniagua reviewed Plaintiff's medical history, noting that Plaintiff had surgeries at his L5-S1 spine segment in 2003 and 2005, complained of intermittent thoracic L-spine, thorax, and leg pain after the surgeries.  Dr. Paniagua observed that Plaintiff appeared normal upon physical examination and had a normal range of motion and movement in his legs.  Dr. Paniagua noted that nerve conduction studies of Plaintiff's legs revealed mild slowing of the left tibial nerve across the ankle/tarsal tunnel with normal appearing bilateral tibial amplitudes and more

proximal conduction velocities.  He noted that Plaintiff's bilateral peroneal and sural responses were within normal limits.  Dr. Paniagua planned to replace all Plaintiff's pain medications with Gabapentin and Nortryptaline with monthly evaluations, gradually increasing the dose of Nortriptyline as tolerated.

On November 28, 2016, Plaintiff self-declared a medical emergency for numbness in his left leg.  Nurse Niemeyer responded to the emergency, and Plaintiff reported numbness that started in his back and went down the back of his left leg and bottom of his foot. He reported that a motor vehicle accident and subsequent surgical complications were the sources of intermittent numbness. He stated that he knew his pain was going to be bad after exercising earlier, and stated that he was afraid his leg would give out and cause him to fall.  Nurse Niemeyer observed that Plaintiff's body movements appeared coordinated and balanced with a steady gait. She determined that Plaintiff's vital signs were normal and that his symptoms did not constitute a medical emergency.  Nurse Niemeyer educated Plaintiff about his plan of care, informed him that the pending request for Gabapentin had not yet been approved, and instructed him to return to medical if his symptoms worsened.

On November 30, 2016, Plaintiff was seen by Dr. Paniagua, who informed Plaintiff that his recommendation for Gabapentin was denied by Corizon regional managers who first suggested an alternate treatment plan in which Plaintiff's pain

would be managed by Pamelor (Nortriptyline), a medication used to treat nerve pain that he was already taking at bedtime. Plaintiff stated that he was aggravated about the alternate treatment plan and voiced his concern that something bad might happen after exercising on the elliptical. Dr. Paniagua encouraged Plaintiff to exercise but cautioned him to not overdo it. Plaintiff voiced his understanding of the treatment plan, and Dr. Paniagua planned to re-evaluate Plaintiff's pain in two months.

On December 2, 2016, Plaintiff filed two HSRs for back pain and leg pain. He also claimed that he had not had any pain medication since November 27.

On December 8, 2016, Defendant Brennan saw Plaintiff at an appointment. Plaintiff complained of chronic back and leg pain and stated that Nortriptyline did not relieve his pain and caused side effects of restless legs. Upon observation, Brennan noted no abnormality detected in Plaintiff's physical examination and observed that he walked normally. Brennan referred Plaintiff for an appointment with Dr. Paniagua for further evaluation of his pain medications.

Brennan never told Plaintiff that she refused to provide treatment to him because he smoked cigarettes. In fact, Brennan recorded in her notes of the December 8 encounter that Plaintiff said he was a non-smoker. Although Brennan often educated her patients at NECC that smoking cigarettes was likely to reduce

the effectiveness of their pain medications, she never refused to treat patients because they were smokers.

On December 9, 2016, Nurse Wiley saw Plaintiff to address his complaints of not receiving any pain medications since November 27.  Upon further discussion, Plaintiff stated that he had been offered Nortriptyline but refused to take it because it did not work to alleviate his pain.  He told Nurse Wiley that Nortriptyline caused restless leg syndrome as a side effect.  Nurse Wiley informed Plaintiff that his plan of care was for him to try the alternate treatment plan of Nortriptyline for six weeks, and then be re-evaluated.

On December 14, Plaintiff filed an HSR for back pain and numbness in his left leg, stating that his pain medications did not work. On December 20, Plaintiff filed an IRR requesting to be seen by an off-site specialist and requesting that Nortriptyline be replaced with a different pain medication.

On January 4, 2017, Dr. Paniagua saw Plaintiff for the planned six-week follow-up to assess the effectiveness of Nortriptyline in managing Plaintiff's chronic pain.  Plaintiff told Dr. Paniagua that Nortriptyline did not work and caused him to have sleep disturbances.  Dr. Paniagua noted that Plaintiff previously tried Cymbalta, Trileptal, and Zonisamide for pain treatment, but that these medications did not provide relief.  Dr. Paniagua ordered acetaminophen to treat Plaintiff's pain and placed a referral order for Lyrica since other pain

medications had failed. The plan for Lyrica was changed to an alternate treatment plan by Corizon management, and Dr. Paniagua ordered Baclofen, a muscle relaxer, to treat Plaintiff's chronic leg pain.

Chronic pain patients should be on a new pain medication for at least one month to allow it to take full effect and to allow physicians and nurses to accurately assess the ability of the medication to manage the patient's chronic pain. Gabapentin, otherwise known as Neurontin, is used to treat neuropathic pain. Gabapentin has a high potential for abuse within the correctional setting and is habit-forming. There are several other medications that are equally effective or more effective at treating neuropathic pain as Gabapentin. Tramadol, otherwise known as Ultram, is a narcotic used to treat pain. It is a highly-abused, habit-forming medication that is often hoarded or traded in the correctional setting. One of the goals of Plaintiff's treatment plan was to reduce his dependency on habit-forming medication and provide him with effective medications less susceptible to abuse.

On January 18, 2017, Plaintiff filed a Grievance (NECC 16-1632) against Defendant Anderson in which he wrote that she refused to acknowledge his grievance filings and that medical staff refused to see him despite him filing many HSRs. Plaintiff filed another IRR on February 7, 2017 (16-1744) that again complained about numbness in his leg and medical's response to his self-declared

medical emergency on November 17, 2016.  On February 15, 2017, Plaintiff filed

another Grievance (NECC 17-24) complaining that NECC medical staff refused to

acknowledge his grievances.  Although MDOC policy directs that responses to

IRRs should be sent within 40 days of receipt of the IRR, Anderson and other

medical staff were unable to prepare and send a response to Plaintiff's IRRs within

the designated time period because of a severe staffing shortage at the time. As a

result, Plaintiff's IRRs progressed to the grievance stage.

On February 16, 2017, Defendant Brennan saw Plaintiff in Corizon's

"chronic care clinic" for chronic pain.  Defendant Brennan noted that Plaintiff said

he quit smoking "a while ago."  Plaintiff complained of chronic back and leg pain

and reported that he could not stand or sit for extended periods without

experiencing pain.  He also stated that he exercised regularly, but that he

experienced numbness in his leg after three minutes of walking laps and that the

elliptical bothered his leg.  Plaintiff reported that his current medications provided

short-lived relief from numbness, and that a higher dose of medication might be

helpful.  Brennan noted that Nortriptyline and Cymbalta were ineffective at

relieving Plaintiff's pain and noted that Plaintiff had been on Baclofen for one

month.  She referred Plaintiff to a follow-up appointment with the physician to

discuss potential medication changes.

On February 23, 2017, Plaintiff was seen by Corizon physician Dr. Jerry Lovelace for assessment of his chronic pain medications. Plaintiff complained of pain in his lower back and legs. Upon examination, Dr. Lovelace noted no spasms and observed that Plaintiff had a full range of motion in his legs that was associated with mild pain. Dr. Lovelace discontinued the existing order for Baclofen and Tylenol (acetaminophen) and ordered Naproxen, Pantoprazole, Gabapentin, Naprosyn, and Protonix to manage Plaintiff's chronic pain.

On March 30, 2017, the Director of Nursing (DON) issued a response to Plaintiff's Grievance 16-1357 and informed him that his complaint was unsupported because he had been seen multiple times by medical staff in response to his complaints of chronic pain and was under an active treatment plan.

On March 31, 2017, Defendant Anderson issued a response to Plaintiff's Grievance 16-1615 concerning Plaintiff's self-declared medical emergency on November 17, 2016. Anderson wrote in her response that Plaintiff's fall was not communicated to the medical department as a Code 16 that required an immediate response from the nurse. She wrote that according to policy, a self-declared medical emergency is for an emergency condition that requires immediate attention in order to preserve life or bodily function. Anderson wrote that Plaintiff was seen for his complaints on November 17, 2016, treatment was not deemed necessary, and that he was seen in the infirmary to ensure that he was

neurologically stable.  Anderson noted that Plaintiff's IRR for the events on November 17, 2016 was not answered within the designated timeframe due to a staffing crisis, and therefore the IRR progressed to the grievance stage.

On March 31, 2017, Anderson issued a response to Plaintiff's Grievance 16-1744 stating that this Grievance was a duplicate of IRR and Grievance 16-1357 and referred him to the DON's response to Grievance 16-1357.  That day, Anderson also issued a response to Grievance 17-24 and explained that IRR and Grievance responses at NECC had been months behind due to a staging crisis which was slowly improving. She assured Plaintiff that the medical department was always interested in resolving his complaints and would respond to complaints in a timely manner as all medical management staff had been hired and trained.

On April 2, 2017, Plaintiff filed an HSR for back pain.  He was seen by Nurse Selsor on April 5, 2017.  Plaintiff complained of back pain and Nurse Selsor referred Plaintiff to be seen by a physician.

On April 4, 2017, Defendant Anderson issued a response to Plaintiff's IRR 16-1632 in which she informed Plaintiff that his IRR proceeded to the Grievance stage because it was not answered within the designated timeframe due to a staffing crisis.  Anderson had no direct involvement in Plaintiff's care or Grievances after April 4, 2017.  Anderson recorded her interactions with Plaintiff accurately and did not document any false statement into the Plaintiff's medical

record or grievance responses. Anderson never took any action against Plaintiff out of retaliation for him filing any complaint against her or other medical staff. Rather, Anderson's actions were based upon her review of Plaintiff's medical records and delays in her responses to his grievances were the result of staffing shortages.

On May 9, 2017, Defendant Brennan saw Plaintiff to follow-up on his chronic back pain. Plaintiff reported that Gabapentin provided some relief for his numbness, and that he continued to walk and exercise regularly. He requested renewal of Gabapentin and for his order for Naproxen to be changed to an order for ibuprofen taken on an as-needed basis. Brennan renewed Plaintiff's medications, which had been prescribed by a Corizon physician, and ordered ibuprofen to treat Plaintiff's chronic pain. She recommended that another Corizon physician, Dr. Michael Whitlock, follow-up with Plaintiff to assess his ongoing need for Gabapentin.

On May 18, 2017, Plaintiff saw Defendant Brennan for a follow-up appointment for pain management. Plaintiff reported that Gabapentin helped relieve numbness in his left leg but was concerned that the order for Gabapentin might expire before he received a re-fill order. Brennan referred Plaintiff for an additional chronic care appointment for medication renewal in July 2017. Brennan observed that Plaintiff had balanced ambulation and was able to bear weight on his

left foot.  She noted Plaintiff's report that he was able to exercise and that MDOC custody staff reported that Plaintiff was active and exercising.  Brennan had no further encounters with the Plaintiff after May 18, 2017.

Defendant Brennan recorded the Plaintiff's medical treatment accurately and did not document any false statement into the Plaintiff's medical record.  Plaintiff's activities of daily living were not significantly affected by his condition during the relevant time period, as he was able to exercise regularly during his time at NECC.

## Summary Judgment Standard

The Eighth Circuit has articulated the appropriate standard for consideration of motions for summary judgment, as follows:

> Summary judgment is proper if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. The movant bears the initial responsibility of informing the district court of the basis for its motion, and must identify those portions of the record which it believes demonstrate the absence of a genuine issue of material fact. If the movant does so, the nonmovant must respond by submitting evidentiary materials that set out specific facts showing that there is a genuine issue for trial. On a motion for summary judgment, facts must be viewed in the light most favorable to the nonmoving party only if there is a genuine dispute as to those facts. Credibility determinations, the weighing of the evidence and the drawing of legitimate inferences from the facts are jury functions, not those of a judge. The nonmovant must do more than simply show that there is some metaphysical doubt as to the material facts, and must come forward with specific facts showing that there is a genuine issue for trial. Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.

*Torgerson v. City of Rochester,* 643 F.3d 1031, 1043 (8th Cir. 2011) (*en banc*) (internal citations and quotation marks omitted). "Although the burden of demonstrating the absence of any genuine issue of material fact rests on the movant, a nonmovant may not rest upon mere denials or allegations, but must instead set forth specific facts sufficient to raise a genuine issue for trial." *Wingate v. Gage Cnty. Sch. Dist., No. 34,* 528 F.3d 1074, 1078–79 (8th Cir. 2008) (cited case omitted). With this standard in mind, the Court accepts the above listed facts as true for purposes of resolving the parties' motions for summary judgment.

## Discussion

The Eighth Amendment prohibition on cruel and unusual punishment extends to protect prisoners from "deliberate indifference to serious medical needs." *Gregoire v. Class,* 236 F.3d 413, 417 (8th Cir. 2000). Allegations of medical malpractice, inadvertent failure to provide adequate medical care, or simple negligence do not amount to a constitutional violation. *Estelle v. Gamble,* 429 U.S. 97, 106 (1976); *Popoalii v. Correctional Med. Servs.,* 512 F.3d 488, 499 (8th Cir. 2008); *Smith v. Clarke,* 458 F.3d 720, 724 (8th Cir. 2006). Rather, the plaintiff must establish that the official "intentionally den[ied] or delay[ed] access to medical care, or intentionally interfer[ed] with treatment or medication that has been prescribed." *Vaughan v. Lacey,* 49 F.3d 1344, 1346 (8th Cir.1995). Furthermore, "prison officials do not violate the Eighth Amendment when, in the

exercise of their professional judgment, they refuse to implement a prisoner's requested course of treatment," since prisoners do not have a right to any particular course of medical care. *Long v. Nix,* 86 F.3d 761, 765 (8th Cir.1996) (citing *Kayser v. Caspari,* 16 F.3d 280, 281 (8th Cir.1994)); *Taylor v. Turner,* 884 F.2d 1088, 1090 (8th Cir.1989). "[N]othing in the Eighth Amendment prevents prison doctors from exercising their independent professional judgment." *Long,* 86 F.3d at 765. Accordingly, under Eighth Circuit law, "mere disagreement with treatment decisions does not rise to the level of a constitutional violation." *Popoalii,* 512 F.3d at 499 (*quoting Estate of Rosenberg v. Crandell,* 56 F.3d 35, 37 (8th Cir.1995)).

**Defendant Anderson**

In his Complaint, Plaintiff claims that Defendant Anderson's neglect and indifference led to the medical staff labeling Plaintiff's leg pain and loss of feeling as non-emergency. Plaintiff claims that Anderson's "actions are what led to a process of procedures that ultimately resulted in" his falling and hitting his head. Plaintiff also alleges that Anderson did not respond to his grievances regarding the "emergency" issue. Finally, Plaintiff claims Anderson altered his medical records to include appointments that did not actually happen.

First, the Court notes that Plaintiff's allegation that Anderson entered false information into or altered his medical records is patently refuted by the undisputed facts. Anderson is entitled to summary judgment on that claim.

Anderson is also entitled to summary judgment on Plaintiff's claims that he was denied due process by Anderson's untimely responses to his grievances, and that Anderson's actions caused medical staff to refuse to label his pain and numbness as an emergency.

As to the failure to respond to grievances/due process claim, MDOC's administrative policy for inmate grievances does not "in and of [itself] create a liberty interest in access to that procedure." *Flick v. Alba*, 932 F.2d 728 (8th Cir. 1991). In any event, Anderson eventually did respond to Plaintiff's grievances. The delay in her responses was merely the result of understaffing in the medical unit. Summary judgment is entered in Anderson's favor as to Plaintiff's due process claim.

As to the claim that Anderson implemented procedures that caused his injury, a supervisor may not be held liable for §1983 violations on a theory of *respondeat superior*. *Boyd v. Knox*, 47 F.3d 966, 968 (8th Cir. 2005). Instead, to be held liable, a supervisor must be personally involved in or deliberately indifferent to a constitutional violation. *Id.* "The supervisor must know about the

conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what [he or she] might see." *Id.* (internal quotation omitted).

The undisputed facts show that MDOC, not Anderson, created the emergency policy. There is no evidence that Anderson had any involvement in developing the emergency procedures that allegedly led to Plaintiff's injury. Furthermore, Anderson was not deliberately indifferent to Plaintiff's health. Anderson was not involved in the November 17 incident, nor was she responsible for developing Plaintiff's treatment plan. When Plaintiff told Anderson on October 28, 2016 that he was afraid he may fall due to the pain and numbness in his leg, Anderson was not indifferent. Rather, she encouraged him to request medical services, which he did on November 1, 2016. Anderson is entitled to summary judgment.

**Defendant Brennan**

In his Complaint, Plaintiff alleges that Defendant Brennan refused Plaintiff "any sort of treatment" because Plaintiff smoked cigarettes. The Complaint alleges that on one occasion when Plaintiff declared an emergency due to pain, Brennan told him "Until you quit smoking, I'm not going to do anything for you." The undisputed facts show that Brennan never refused to treat Plaintiff, or made any statements about refusing to treat Plaintiff based on his purported status as a smoker.

Moreover, the undisputed facts show that Brennan was not deliberately indifferent to Plaintiff's medical needs. As to the November 17, 2016 incident, there is no evidence that Brennan was involved in the MDOC staffs' decision not to issue a CODE 16 for medical emergency to the medical staff. When a nurse responded to Plaintiff's medical complaint, Defendant Brennan ordered Plaintiff placed in the infirmary based on elevated pulse, blood pressure, and a potential head injury. Brennan is entitled to summary judgment.

As noted earlier herein, "Although the burden of demonstrating the absence of any genuine issue of material fact rests on the movant, a nonmovant may not rest upon mere **denials or allegations** [Emphasis added], but must instead set forth specific facts sufficient to raise a genuine issue for trial." *Wingate v. Gage Cnty. Sch. Dist., No. 34,* 528 F.3d 1074, 1078–79 (8th Cir. 2008) (cited case omitted). Plaintiff has failed to respond or file anything to refute Defendants.

### Conclusion

Based upon the foregoing analysis, Defendants are entitled to judgment as a matter of law. The undisputed material facts establish that Defendants have not been deliberately indifferent to Plaintiff's serious medical needs. As such, Defendants' Motion for Summary Judgment will be granted.

Plaintiff's pending Motion for order to obtain medical treatment does not concern the Defendants in the instant case. As such, it will be denied.

Accordingly,

**IT IS HEREBY ORDERED** that Defendant's Motion for Summary Judgment, [Doc. No. 105], is **GRANTED**.

**IT IS FUTHER ORDERED** that Plaintiff's Motion for order to obtain medical treatment [Doc. No. 124], is **DENIED**.

A separate judgment in accordance with this Opinion, Memorandum and Order is entered this same date.

Dated this 17th day of September, 2019.

HENRY EDWARD AUTREY
UNITED STATES DISTRICT JUDGE